## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH PAOLUCCI,                    : Civil No. 1:24-CV-1376
                                    :
    Plaintiff,                   :
                                    :
        v.                   :
                                    : (Chief Magistrate Judge Bloom)
LELAND DUDEK, Acting                :
Commissioner of Social Security,[1] :
                                    :
    Defendant.                   :

## MEMORANDUM OPINION

### I. Introduction

Joseph Paolucci filed an application under Title II of the Social Security Act for disability and disability insurance benefits on March 2, 2022. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Paolucci was not disabled during the closed period of alleged disability from September 13, 2019 through June 1, 2022.

Paolucci now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record,

---

[1] Leland Dudek became the Acting Commissioner of the Social Security Administration on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Leland Dudek is substituted as the defendant in this suit.

and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supports the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

Joseph Paolucci filed for disability and disability insurance benefits, alleging disability due to knee problems, low back pain, kidney issues, anxiety, and left elbow pain. (Tr. 57). Paolucci was 45 years old at the time of his alleged onset of disability, had at least a high school education, and had past relevant work as a delivery driver, retail salesclerk, and athletic trainer. (Tr. 26-26).

The medical record regarding Paolucci's impairments[2] revealed that Paolucci suffered a work-related knee injury in June of 2019. (Tr.

---

[2] The plaintiff's appeal focuses mainly on his knee and kidney issues. Accordingly, while the record contains treatment notes regarding other impairments, we focus our discussion primarily on Paolucci's records concerning these physical impairments.

2

265).    On examination, Paolucci had no swelling, effusion, joint tenderness, or circumduction pain. (Tr. 266). Dr. Eugene Kim, M.D., opined that it may be related to his lumbar spine and recommended Paolucci continue using his knee sleeve. (*Id.*). At a follow up visit one month later, Paolucci presented with medial joint tenderness and mild circumduction pain on examination. (Tr. 267). Dr. Kim ordered an MRI, which indicated posterior horn tear medical meniscus with mild to moderate degenerative change. (Tr. 269). Paolucci elected to proceed with a right knee arthroscopy and partial medial meniscectomy in September of 2019. (Tr. 269, 780).

At his one-week follow up with Dr. Kim, Paolucci reported that he was doing well but had pain after doing too much. (Tr. 271). Dr. Kim prescribed him naproxen and recommended icing his knee, and further noted that Paolucci should not work. (*Id.*). By November, Paolucci reported discomfort but was doing better, noting that therapy was helping. (Tr. 275). Dr. Kim indicated that his symptoms were improving and placed him on a sedentary work restriction. (*Id.*). However, in December, Paolucci reported to an orthopedic specialist that he was

3

looking for a second opinion, as his knee felt the same as it did prior to surgery. (Tr. 528).

In January of 2020, Paolucci treated with Dr. Thomas Meade, M.D., for his right knee, reporting that he was still experiencing pain that affected his quality of life. (Tr. 769). Dr. Meade ordered an MRI and noted that Paolucci should remain out of work until the next evaluation. (*Id.*). Paolucci received injections for his knee in February and March, and Dr. Meade recommended biking, walking, and gentle workout exercises for his lower extremities. (Tr. 770-71). On examination, Paolucci exhibited tenderness and an antalgic gait but no effusion or swelling. (Tr. 774). Paolucci received another injection in April. (Tr. 776).

Paolucci treated with Dr. David Kolessar, M.D., in August of 2020 for a third opinion regarding his knee pain. (Tr. 526). On examination, Paolucci ambulated favoring his right lower extremity and exhibited medial joint line tenderness, but had excellent muscle tone and strength, as well as full range of motion. (Tr. 526-27). Dr. Kolessar noted that conservative measures, such as biking, were valuable, and Paolucci

reported that he was in the process of litigation and his attorney advised him not to walk outside to avoid being videotaped. (*Id.*).   In November, Paolucci reported that he "want[ed] his knee pain better" and advised Dr. Kolessar that he wanted to proceed with surgery. (Tr. 521-23).   On examination, Paolucci had medial joint line tenderness, excellent muscle strength and tone, full range of motion, and a gait pattern favoring his right lower extremity. (Tr. 522). Dr. Kolessar advised Paolucci that it was his practice that his patients settle any litigation efforts prior to non-emergent surgery. (*Id.*).   Paolucci ultimately underwent a total right knee replacement in December of 2020. (Tr. 489).

At a follow up visit in February of 2021, Paolucci reported doing well with no pain, just soreness. (Tr. 482). He further reported he had been working out with a private trainer. (*Id.*). Dr. Kolessar advised that weight training and squats were not appropriate and could cause failure of the knee arthroplasty, and further advised Paolucci that biking programs were best at that time. (*Id.*). Several days later, Paolucci reported that he was doing well until he stepped out of a truck and tweaked his knee. (Tr. 481). He further reported that he had worked the

night prior and noticed increased swelling after being on his feet all day. (*Id.*). An examination revealed mild edema, near full range of motion, and no signs of knee maltracking, also known as patellar tracking disorder. (*Id.*). At his appointments in April and May of 2021, Paolucci indicated he was doing well with no pain, working out in the gym regularly, and doing more activities. (Tr. 457-58, 475-76).

Around this time, Paolucci was treated for left elbow pain. (Tr. 978). He reported that certain gym exercises were causing him discomfort, and that an elbow brace seemed to help his symptoms. (*Id.*). An x-ray showed no acute bony abnormalities, and Paolucci proceeded with an injection. (Tr. 980). In July of 2021, Paolucci also reported lower back pain starting after his knee replacement. (Tr. 1123). He further reported pain during activity, while resting, and while sleeping. (*Id.*). It was noted that Paolucci had tried physical therapy and personal training. (*Id.*). On examination, Paolucci exhibited no tenderness, a normal gait, a negative straight leg raise, and full range of motion. (Tr. 1126). An x-ray of Paolucci's lumber spine revealed mild to moderate degenerative changes. (Tr. 1153). In February of 2022, Paolucci reported some

6

soreness in his knee but that he had been doing most activities. (Tr. 422).

On examination, he had a smooth gait, good motion in his right lower

extremity, full extension flexion, and 5/5 strength. (Tr 423). He

expressed that he wanted to start running but was advised against it.

(Tr. 424).

During the period of alleged disability, Paolucci also treated for

chronic kidney disease. In December of 2020, prior to his knee

replacement, treatment notes indicate that Paolucci was feeling

generally well, reporting that he was "perfectly fine" and exhibiting no

symptoms. (Tr. 765). Treatment notes from March of 2021 indicate that

Paolucci had been on therapeutic phlebotomy since December of 2020.

(Tr. 324). At this time, it was noted that Paolucci self-catheterized three

times daily, but that his chronic kidney disease improved, and his

creatinine had "essentially normalized." (Tr. 738-39). Paolucci stopped

his phlebotomy treatments in April of 2021 because his numbers

remained low, but in September, he resumed treatment after reporting

increased facial plethora and fatigue. (Tr. 811-12). Paolucci continued

phlebotomy treatments, and in March of 2022, he reported feeling

generally well with no tiredness or fatigue. (Tr. 803). Treatment notes after the disability period indicate that Paolucci's creatinine was stable, and he self-catheterized up to six times daily. (Tr. 1178, 1184).

It is against the backdrop of this record that an ALJ held a hearing on Paolucci's disability application on September 12, 2023. (Tr. 32-55). Paolucci and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on October 23, 2023, the ALJ issued a decision denying Paolucci's application for disability benefits. (Tr. 11-31). The ALJ first concluded that Paolucci had not engaged in substantial gainful activity for the closed period between September 13, 2019, through June 1, 2022. (Tr. 16). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Paolucci suffered from the following severe impairments: chronic kidney disease, and degenerative joint disease of the right knee status post total knee replacement. (Tr. 17). At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 19-20).

Between Steps 3 and 4, the ALJ then concluded that Paolucci:

> [H]a[d] the residual functional capacity to perform a limited
> range of light work as defined in 20 CFR 404.1567(b), except
> he is capable of standing and walking for four hours. The
> claimant can occasionally balance and stoop, but never kneel,
> crouch, nor crawl.

(Tr. 20).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Paolucci's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the 2019 opinions from Dr. Kim and found these opinions only partially persuasive. (Tr. 24). The ALJ reasoned that Dr. Kim's limitations were not supported during the entire period of alleged disability, as the records showed that after his knee surgery, Paolucci had excellent muscle strength, full range of motion, and minimal patellar crepitation. (*Id.*).

The ALJ also considered the opinions of the state agency reviewing physicians, Dr. Whang, and Dr. Hubbard, and found these opinions unpersuasive. (Tr. 24-25). These physicians opined that Paolucci could perform a range of light work, including sitting, standing, and walking for up to six hours; could occasionally push and use hand controls with

his left upper extremity; and that Paolucci had a number of environmental limitations. (Tr. 61-65, 70-73). The ALJ found that Paolucci was more limited in some of his postural movements than these providers, as he limited Paolucci to standing or walking for only four hours but found that these providers' limitations regarding Paolucci's left upper extremity were not supported by the findings in the record of 5/5 strength and full range of motion. (*Id.*). The ALJ further declined to adopt the providers' environmental limitations based on the negative and stable examination findings in the record. (Tr. 25).

With respect to Paolucci's symptoms, the ALJ found that Paolucci's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 21-24). Paolucci testified that his knee and back pain prevented him from working, and that he could not take pain medications because he was a recovering addict. (Tr. 45). He further reported that his need to self-catheterize led to infections that became a problem. (*Id.*). He testified that he had problems sleeping at night due to his constant pain. (Tr. 44-45). Paolucci stated that his knee was no better after his knee

replacement surgery, and that the Motrin he was taking was affecting his kidneys. (Tr. 48).

The ALJ ultimately found Paolucci's testimony to be inconsistent with the objective clinical findings. (Tr. 21-24). The ALJ detailed the medical records, including the records regarding Paolucci's knee, back, and kidney issues. (*Id.*). The ALJ reasoned that as of February 2021, Paolucci's records indicated that his kidney disease had improved and his obstructive uropathy was unchanged. (Tr. 22). The ALJ further noted that records from September of 2022 and March of 2023 indicated Paolucci was self-catheterizing up to six times per day, but his creatinine was stable. (*Id.*). As to Paolucci's knee pain, the ALJ noted the history of knee surgery, including the arthroscopy and total knee replacement. (Tr. 22). The ALJ then detailed the records after Paolucci's surgeries, noting that he had excellent muscle strength, full range of motion, no swelling or edema, and in May of 2021, Paolucci reported doing "excellent." (*Id.*). The ALJ also noted Paolucci's activities of daily living, which included household chores, shopping, spending time with others, and working during the relevant period. (Tr. 23-24). Ultimately, the ALJ

found that despite Paolucci's limitations, he could perform work within the parameters of the RFC. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Paolucci was unable to perform his past work but found at Step 5 that he could perform the occupations of photocopy machine operator, small parts assembler, and electrical accessories assembler. (Tr. 27). Accordingly, the ALJ found that Paolucci had not met the stringent standard prescribed for disability benefits and denied his claim. (*Id.*).

This appeal followed. On appeal, Paolucci argues that the ALJ's consideration of the medical opinion evidence and his subjective symptoms is not supported by substantial evidence. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42

U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record

as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also*

14

*Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear

and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by

17

substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x

18

6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in March of 2022 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her

written decision.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."  *Mason*, 994 F.2d at 1066.  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so

long as the rationale behind the decision is adequately articulated. *See*

*Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other

hand, in cases where no medical opinion credibly supports the claimant's

allegations, "the proposition that an ALJ must always base his RFC on a

medical opinion from a physician is misguided." *Cummings*, 129 F. Supp.

3d at 214–15.

### D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

When evaluating lay testimony regarding a claimant's reported

degree of pain and disability, the ALJ must make credibility

determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir. 2009).

Our review of those determinations is deferential. *Id.* However, it is

incumbent upon the ALJ to "specifically identify and explain what

evidence he found not credible and why he found it not credible." *Zirnsak*

*v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ

should give great weight to a claimant's testimony "only when it is

supported by competent medical evidence." *McKean v. Colvin*, 150 F.

Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted). As the Third

Circuit has noted, while "statements of the individual concerning his or

her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting

effects of his or her symptoms are substantiated considering the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and

other factors regarding the claimant's functional limitations.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

E. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Paolucci first challenges the ALJ's treatment of Dr. Kim's 2019 medical opinions, contending that the ALJ should have assigned more weight to these opinions because Dr. Kim was a treating provider.   At the outset, we note that this appeal was filed after March of 2017, and as such, the regulations providing that more weight should be assigned to a treating physician were no longer in effect.  Instead, an ALJ is required to explain how persuasive a medical opinion is, discussing its supportability and consistency with the medical evidence.  The ALJ

discussed Dr. Kim's 2019 opinions that Paolucci should remain off work, and thereafter, restricted to sedentary work.  (Tr. 24).  The ALJ concluded that these restrictions were not supported by the entirety of the record during the closed period and found them only partially persuasive.  (*Id.*).  In doing so, the ALJ explained that after Paolucci treated with Dr. Kim, records indicate that he exhibited excellent muscle strength, had full range of motion, and exhibited minimal patellar crepitation.  (*Id.*).

The ALJ also considered the opinions of the state agency consulting physicians, who opined that Paolucci could perform a range of light work including sitting, standing, and walking for up to six hours per day, and found these opinions unpersuasive.  (Tr. 24-25).  With respect to the postural limitations opined by these providers, the ALJ actually further restricted Paolucci, limiting him to only four hours of sitting, standing, and walking based on the records and testimony regarding Paolucci's knee impairment.  (Tr. 24).

Thus, in this case, the ALJ was faced with medical opinions containing a variety of restrictions based on Paolucci's impairments.  The

ALJ considered each of these opinions and ALJ fashioned an RFC that included some limitations set forth by these three medical providers, and further, explained which specific limitations he declined to adopt and why, citing objective medical evidence in the claimant's records. That is all that is required of the ALJ under the controlling regulations. Accordingly, we conclude that the ALJ's assessment of Dr. Kim's medical opinion is supported by substantial evidence.

Similarly, we conclude that the ALJ's treatment of Paolucci's subjective symptoms is supported by substantial evidence. The ALJ discussed the objective medical evidence, as well as Paolucci's testimony concerning the same, at length. However, the ALJ concluded that Paolucci's disabling allegations of pain were not entirely credible or supported by the medical evidence. Notably, as the ALJ mentioned, Paolucci continued to work out at the gym and work at least part time during the relevant period of alleged disability. The ALJ gave a detailed explanation of the medical evidence that supported his conclusion that the plaintiff's pain and symptoms were not as disabling as he alleged. This evidence included medical treatment notes, medical opinion

evidence, and Paolucci's reported activities of daily living, all of which an ALJ is permitted to consider when assessing a claimant's credibility. Accordingly, we conclude that the ALJ's assessment of Paolucci's symptoms was adequately explained, and as such, supported by substantial evidence.

Although the record in this case contained abnormal findings during the relevant period, such as treatment notes documenting Paolucci's subjective complaints of pain, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner in this

case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 7th day of April 2025.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge
